IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| JENNIFER LYNN FITCH, | CASE NO. 1:23-cv-2375 |
| Plaintiff, | DISTRICT JUDGE |
| | BRIDGET MEEHAN BRENNAN |
| vs. | |
| | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Jennifer Lynn Fitch filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In September 2021, Fitch filed an application for disability insurance benefits alleging a disability onset date of September 9, 2021,[1] and claiming she was disabled due to multiple sclerosis, neck pain, back pain, numbness in

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

her fingers, fatigue, light headedness, and depression. Tr. 124, 255, 277. The Social Security Administration denied Fitch's application and her motion for reconsideration. Tr. 168, 180. Fitch then requested a hearing before an Administrative Law Judge (ALJ). Tr. 209.

In December 2022, an ALJ held an administrative hearing. Fitch and a vocational expert testified. Tr. 147–67. Later that month, the ALJ issued a written decision finding that Fitch was not disabled. Tr. 124–38. The ALJ's decision became final on October 13, 2023, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Fitch filed this action on December 13, 2023. Doc. 1. She asserts the following assignments of error:

> 1. The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling 16-3p and found that the effect of the combination of Plaintiff's symptoms related to her Multiple Sclerosis allowed her to engage in substantial gainful activity on a full-time and sustained basis.
>
> 2. The Social Security Administration erred when they failed to include evidence which was submitted, and which provided evidence regarding Plaintiff's ongoing symptoms related to her Multiple Sclerosis.

Doc. 7, at 1.

**Evidence**

*Personal and vocational evidence*

Fitch was born in 1975 and was 46 years old on her alleged disability onset date. Tr. 136. She completed high school. Tr. 147. She used to work at a

2

company performing background checks and at a daycare facility. Tr. 148–49, 278.

*Relevant medical evidence*

Fitch was diagnosed with multiple sclerosis in 2006. Tr. 453. In January 2021, she saw a neuropsychologist for neuropsychological testing due to her reports of cognitive issues, including "fogginess" and memory problems. Tr. 453, 585. Fitch said that she worked at a daycare facility, which left her "too exhausted to manage her responsibilities at home." Tr. 445, 453. The doctor's exam findings did not show evidence of a memory disorder or other neurocognitive syndrome. Tr. 545. The doctor commented that his exam was most noteworthy for Fitch's questionnaire responses, which indicated moderately severe depression. Tr. 454.

About ten days later, Fitch underwent a functional capacity evaluation with physical therapist Matt Sutliff. Tr. 444. Fitch said that she experienced fatigue, which had worsened since 2013 and 2018 when she had previous physical therapy evaluations. Tr. 444. Fitch said that she had good days and bad days, with pain every day that waxed and waned in severity. Tr. 444. She reported numbness in her fingers and difficulty feeling items that she picked up. Tr. 444. After the evaluation, Sutliff concluded that Fitch's "functional status has remained quite consistent over these past 8 years." Tr. 452. He opined that Fitch could work full time at the "sedentary-light" level of physical exertion. Tr. 452.

3

In May 2021, Fitch saw her primary care provider. Tr. 380. He commented that Fitch's multiple sclerosis was clinically stable with the medication Ocrevus. Tr. 380.

In November 2021, a month after Fitch's alleged disability onset date, she had a six-month follow-up visit with certified nurse practitioner Kathleen Harris at the Mellen Center for Multiple Sclerosis. Tr. 584. Harris detailed Fitch's history, including noting that Fitch had been taking Ocrevus since September 2017 and that her May 2021 brain MRI results were "stable." Tr. 585. Fitch said that in May 2021, she quit her job at the daycare and started a new job doing background checks, but she lost that job "due to cognitive concerns." Tr. 585. She couldn't "keep up with the demands and was laid off." Tr. 585. Fitch said that overall, she felt "stable." Tr. 585. She continued to have "tingling" in her fingers and reported mild fatigue and trouble multitasking. Tr. 586. Her prescribed medication, Nuvigil, helped her fatigue. Tr. 585. Harris's exam findings showed that Fitch appeared well and had a normal affect, memory, and "higher intellectual functioning." Tr. 587. Her gait, balance, coordination, and muscle strength in all areas, including grip strength, were normal. Tr. 587. Harris continued Fitch's Ocrevus and recommended that Fitch return in six months "or sooner if needed." Tr. 588.

In January 2022, Fitch saw Paul Oh, M.D., for a physical consultative exam. Tr. 559–68. Fitch listed her multiple sclerosis symptoms as numbness in her fingertips; stiffness in her arms and legs; pain in her hands, legs, and

lower back; fatigue; and brain fog. Tr. 559, 562. She reported daily pain levels, including on the day of the exam, as seven-to-eight out of ten. Tr. 559. Medication helped and physical therapy helped "a little." Tr. 559. Her typical daily activities included doing housework, shopping, washing dishes, using the internet, and driving. Tr. 560. Dr. Oh's exam findings showed that Fitch was alert and had normal attention and concentration. Tr. 561. She had decreased sensation to light touch in all of her fingers, but she could lift, carry, and handle light objects and her fine and gross manipulative abilities were "grossly normal." Tr. 562. She could easily squat and rise, walk on her heels and toes, and get up and down from the exam table. Tr. 562. Dr. Oh concluded that Fitch's physical exam was "unremarkable with no pertinent findings." Tr. 563. He commented that Fitch's neuropsychologist had performed a memory and cognitive function test for Fitch's complaints of brain fogginess, and that the results of these tests "were normal with good recall." Tr. 562. Dr. Oh opined that Fitch had mild limitations sitting and moderate limitations standing and walking "due to [multiple sclerosis] with weakness and fatigue." Tr. 563. Fitch had moderate limitations lifting and carrying weight "due to [multiple sclerosis] with weakness and fatigue." Tr. 563. She had no limitations bending, stooping, crouching, and squatting or reaching, grasping, handling, fingering, and feeling. Tr. 563.

In February 2022, Fitch saw Michael Faust, Ph.D., for a psychological consultative exam. Tr. 570–76. When asked why her ability to work was

5

limited, Fitch cited cognitive issues, pain, and extreme fatigue. Tr. 570–71. Fitch denied ever being psychiatrically hospitalized and said she had not received psychological treatment. Tr. 572. Dr. Faust described Fitch as polite, personable, and interactive, but commented that "she tended to be more pensive during the session as she discussed her physical limitations." Tr. 573, 575. She had no difficulty tracking the conversation and "put forth good effort in responding despite her fatigue." Tr. 574.

Dr. Faust diagnosed Fitch with adjustment disorder with depressed mood. Tr. 574. He concluded that there was no evidence of an intellectual, cognitive, or learning disorder that would impair Fitch's ability to understand tasks. Tr. 575. He said that Fitch "may struggle to remember and carry out instructions related to her fatigue and sadness, which impairs her ability to engage and attend to tasks." Tr. 575. Due to her adjustment disorder, Fitch "can be expected to exhibit mild deficits" in attention, concentration, and pace, but she did not exhibit any difficulty with persistence. Tr. 575. And Fitch "could be expected to have some difficulty responding appropriately to work pressures." Tr. 576.

In early May 2022, Fitch saw her primary care doctor for medication management. Tr. 606. The doctor referenced Fitch's vitamin D deficiency and Fitch said that she had "r[u]n out of meds 'awhile ago.'" Tr. 607. The doctor recounted Fitch's medical history, including her last appointment with Harris, and noted that Fitch had an upcoming appointment with Harris. Tr. 607–10.

6

The doctor listed his impressions, including that Fitch had cognitive changes for which he referred Fitch to a psychiatrist. Tr. 610.

Later that month, Fitch saw Harris for a six-month follow-up for multiple sclerosis. Tr. 622. Fitch had a brain MRI in April 2022, which Harris described as "stable." Tr. 622. Fitch described herself as "stable" since her last visit. Tr. 622. Her "short term memory [wa]s her most prominent symptom." Tr. 623. Her fatigue was "manageable" on a daily dose of Nuvigil. Tr. 623. Fitch said that she worked a few hours a week as a driver for InstaCart; it was "helpful" to work "when she is able to." Tr. 623. She also said that the following month, she would be going to South Carolina to visit her daughter and granddaughter. Tr. 622. Fitch's physical and cognitive exam findings were normal. Tr. 624–25. Harris continued Fitch's medications and instructed her to return in six months "or sooner if needed." Tr. 626.

In November 2022, Fitch returned to Harris for her six-month visit. Tr. Tr. 747, 749. Fitch reported that overall, she felt stable. Tr. 749. She said that she did not feel that she could work "from a cognitive standpoint"—she had difficulty remembering tasks and "brain fog." Tr. 749. She felt depressed due to financial strains and fatigue "continue[d] to be bothersome." Tr. 749. Nuvigil was "somewhat beneficial" for her fatigue. Tr. 749. Harris assessed Fitch's exam as "stable." Tr. 751. She continued Fitch's medications and added a trial of Zoloft, an antidepressant. Tr. 751. Based on Fitch's reports of "cognitive and mental health decline," Harris referred Fitch for "repeat [neuropsychiatric

7

testing] to establish a new baseline." Tr. 751. Fitch was to return in six months "or sooner if needed." Tr. 751.

*State agency opinions*[2]

In February 2022, Indira Jasti, M.D., reviewed Fitch's record and concluded that Fitch's impairments did not satisfy Listing 11.09, the listing for multiple sclerosis.[3] Tr. 173. Regarding Fitch's physical residual functional capacity[4] (RFC), Dr. Jasti concluded that in an eight-hour workday, Fitch could stand and walk for a total of four hours and sit for about six hours. Tr. 174. She could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, and had postural, manipulative, and environmental limitations.

---

[2]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[3]    The "listings" are found at 20 C.F.R Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each body system section has an Introduction, which contains information relevant to that system, and a Category of Impairments, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *Id.*; 20 C.F.R. § 404.1525.

[4]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

Tr. 174–75. In May 2022, Leon Hughes, M.D., reviewed Fitch's record and affirmed Dr. Jasti's findings. Tr. 185–88. And in June 2022, Francis Buda, M.D., reviewed Fitch's records and agreed with Drs. Jasti's and Hughes's physical RFC assessment. Tr. 643–44.

In March 2022, Karla Delcour, Ph.D., reviewed Fitch's record and concluded that Fitch's mental impairments did not meet a listing. Tr. 172–73. Regarding Fitch's mental RFC, Dr. Delcour concluded that Fitch could perform work with no strict production quotas, have superficial interaction with others, and perform tasks that are static in nature. Tr. 176–77. In May 2022, Audrey Todd, Ph.D, reviewed Fitch's record and agreed with Dr. Delcour's assessment. Tr. 183–84.

*Hearing testimony*

Fitch, who was represented by counsel, testified at the December 2022 telephonic administrative hearing. Fitch stated that she has a driver's license and drove short distances—no more than 20 minutes—once or twice a week. Tr. 147–48. This has been the case for the few months before the hearing—she no longer felt comfortable driving long distances because she lacked focus and had a slower reaction time. Tr. 148, 150. At times she had blurry vision, due to her multiple sclerosis, and this also made it hard to focus. Tr. 150.

When asked why she no longer worked, Fitch said that "a lot of it was cognitive issues." Tr. 151. At her last job performing background checks, she needed to process and turn around information quickly. Tr. 151. But she had

9

problems retaining information when learning the job, so she could not meet her quotas. Tr. 151.

Fitch described her multiple sclerosis symptoms as cognitive and memory issues, numbness in her fingers, sore hands, and vertigo. Tr. 152. She often dropped things, such as a fork or a pen. Tr. 152–53. Nevertheless, she used the dishwasher and did laundry. Tr. 153. She could not stand for long. Tr. 153. She spoke about her memory and cognitive issues—she explained that she would pick up her phone but not remember at first what she planned to do with it, or walk into a room but forget why she did so. Tr. 154–55. She had difficulty focusing when cooking or watching television shows. Tr. 155.

When asked about her fatigue, Fitch said that she was exhausted all day long and had very little energy. Tr. 155. On "horrible fatigue days" she was "pretty much … unable to do anything." Tr. 155–56. Taking a shower exhausted her, so she only showered about twice a week. Tr. 158. She spent about three or four days a week on the couch. Tr. 156. Some weeks were worse than others. Tr. 156. On days when she felt up to it, she performed basic household chores. Tr. 156. In the past, when her children were in school, Fitch would take her kids to school and "give [the] entire house a cleaning." Tr. 157. Her children are now adults, and her daughter and Fitch's husband help Fitch "quite a bit." Tr. 157.

The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as

10

Fitch could perform any work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 162. The vocational expert answered that such an individual could perform the following jobs: mail clerk, routing clerk, and inspector and hand-packager. Tr. 162–63.

Fitch's attorney asked the vocational expert if her answer would change if the individual needed hourly, unscheduled breaks lasting 10 to 15 minutes, and the vocational expert said that such a limitation would be work-preclusive. Tr. 164–65. The attorney asked the vocational expert whether an individual's ability to perform work in a competitive environment would be affected if the individual would need "daily reinstruction due to cognitive and memory issues." Tr. 165. The vocational expert said that such a limitation "would be more indicative of a secluded type of setting and would not be work preclusive." Tr. 165.

### The ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.
>
> 2. The claimant has not engaged in substantial gainful activity since September 9, 2021, the alleged onset date (20 CFR 404.1571 *et seq*.).
>
> 3. The claimant has the following severe impairments: multiple sclerosis (MS), degenerative disc disease of the lumbar and cervical spine, and adjustment disorder with depressed mood (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can stand and/or walk 4 hours in an 8-hour workday. She can frequently finger and feel bilaterally and frequently use hand controls bilaterally. She can frequently climb ramps/stairs, balance, stoop, and crawl, but she can never climb ladders, ropes, or scaffolds. She can frequently be exposed to vibrations. She should never be exposed to unprotected heights or dangerous moving mechanical parts. She cannot perform tasks that require specific production rate quotas such as assembly line work or work that requires hourly quotas. She can tolerate occasional changes in a routine work setting. She can superficially interact [with] supervisors, coworkers, and the public and "superficial" interaction is defined as work that does not involve any work tasks such as arbitration, negotiation, confrontation, being responsible for the safety of others, or directing the work of others.

6. The claimant has no past relevant work (20 CFR 404.1565).

7. The claimant was born [i]n … 1975, and was 46 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

> 11. The claimant has not been under a disability, as defined in the Social Security Act, from September 9, 2021, through the date of this decision (20 CFR 404.1520(g)).

Tr. 126–38.

*New evidence submitted to the Appeals Council*

After the ALJ's December 22, 2022 written decision, Fitch submitted new evidence to the Appeals Council. Tr. 16–120. The new evidence included the results of the neuropsychological testing that Harris had ordered, which occurred on December 20, 2022. Tr. 115. Rachel Galioto, Ph.D., the neuropsychologist performing the exam, relayed Fitch's reports of memory problems and a decline in cognitive abilities "over the last year." Tr. 116. Fitch also reported "significant depression and stress related to financial difficulties" and described "low energy, daily fatigue, and lack of motivation." Tr. 116. Dr. Galioto examined Fitch and summed up her findings as follows:

> Results of this evaluation were most notable for significantly impaired sustained attention in the context of moderately severe depression and anxiety. Mild weaknesses (low average scores) were also observed in immediate and delayed visual memory while the remainder of her performances ranged from average to high average. Though direct comparison to her prior evaluation was somewhat constrained given the use of different (updated) measures, there does not appear to have been significant cognitive decline. In fact, she

demonstrated mild improvements in many areas, which may reflect the effects of repeated testing in a short timeframe (i.e., practice effects). It is unclear whether her ability to sustain her attention over an extended period of time has declined, as this was not previously administered. However, this finding, in isolation, would not be typical for cognitive decline associated with [multiple sclerosis]. Rather, I suspect contribution from significant emotional distress and fatigue (as this was the last test administered) to her current difficulties.

*Recommendations*: Ms. Fitch appears to be experiencing rather significant symptoms of depression and anxiety which are likely negatively impacting her day-to-day cognitive abilities and functioning. I would encourage her to consider engaging in some form of behavioral treatment (psychotherapy, counseling). This can also be helpful for fatigue management.

Tr. 118. Dr. Galioto opined that Fitch "would likely benefit from scheduling breaks when completing difficult and/or sustained tasks, breaking large tasks into smaller components, limiting distractions, and minimizing multitasking demands." Tr. 118.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

14

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the

duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,

477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1.     The ALJ did not err when she evaluated Fitch's reports of symptoms*

Fitch argues that the ALJ "failed to properly apply the criteria of Social Security Ruling 16-3p." Doc. 7, at 8. To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).

17

Fitch recounts some of the evidence in the record, Doc. 7, at 9–12, but fails to explain how this evidence supports her argument that the ALJ erred. Reciting evidence, without more, doesn't show that the ALJ's decision is unsupported by substantial evidence. *See Bass*, 499 F.3d at 509 (explaining that a court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility").

Fitch argues that the ALJ erred at step three when she evaluated whether Fitch satisfied Listing 11.02. Doc. 7, at 12. She writes, "[i]n making this finding, the ALJ erroneously disregarded the symptoms related to [Fitch's] relapsing remitting MS." *Id.* But Fitch doesn't say what about the ALJ's evaluation of Listing 11.02, Tr. 127–28, was erroneous. So Fitch's step three argument is forfeited. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted); *see also Small v. Endicott*, 998 F.2d 411, 417–18 (7th Cir. 1993) ("judges are not also required to construct a party's legal arguments for" the party); *Patterson v. Stark Cnty. Bd. of Cnty. Commissioners*, No. 18-cv-2542, 2019 WL 2410854, at *2 (N.D. Ohio June 7, 2019) ("It is not the Court's job to … construct arguments for the parties.").

Fitch cites *Perez v. Comm'r of Soc. Sec. Admin.*, No. 1:18-cv-833, 2019 WL 950243 (N.D. Ohio Feb. 27, 2019), in support of her argument, Doc. 7, at 12, but doesn't attempt to align the facts of this case with the facts in *Perez*. In *Perez*, the plaintiff argued that the ALJ failed to provide adequate reasons for discounting the plaintiff's multiple sclerosis symptoms, including diplopia (double vision). 2019 WL 950243, at *2, 7. The district court remanded the ALJ's decision because the ALJ failed to explain whether or why she discounted Perez's diplopia. *Id.* at *8. The court explained that "[a]n assessment of Perez' diplopia is critical because the ALJ found that Perez could perform her past work as an accounting clerk and bookkeeper, both of which require significant computer use and close interaction with documents." *Id.* But the facts in *Perez* are not the same as the facts here.

Here, Fitch complains that the "ALJ erroneously failed to include any limitations related to [Fitch's] documented continuing fatigue and memory issues." Doc. 7, at 12. Fitch doesn't say where the ALJ "failed to include any limitations"—I assume she means the RFC assessment. Her argument fails because, as explained below, the ALJ evaluated Fitch's reports of fatigue and memory issues and explained why she assessed the RFC limitations, including those accounting for Fitch's fatigue and mental impairments.

In her decision, the ALJ thoroughly discussed the reports of fatigue and memory issues that Fitch made in her disability application, at the administrative hearing, and in her reports to multiple providers. Tr. 130–35.

19

The ALJ explained why she discounted Fitch's reports of disabling fatigue and mental impairments. Tr. 133–34. In doing so, the ALJ noted that brain MRIs continued to show that Fitch's multiple sclerosis was stable. Tr. 133. She commented that Fitch reported that medication helped her fatigue. Tr. 131; *see also* Tr. 133 (ALJ noting that Fitch described her fatigue as "manageable"). The ALJ noted that Fitch's physical and mental exam findings were mostly normal, other than, in relevant part, Dr. Faust's observation that Fitch "appeared fatigued, pensive, and sad" during the consultative exam. Tr. 133–34. Earlier in her decision, the ALJ spent over a page discussing Dr. Faust's exam, in relevant part as follows:

> Regarding the four work-related mental abilities, Dr. Faust expressed the following medical opinion: (1) the claimant's cognitive skills appear to be in the average range and she reported no issues with learning disorders in school. She completed the information form independently here today and did not have difficulty understanding questions or instructions. The claimant reported some slower information processing and forgetfulness related to "brain fog," which she associated with multiple sclerosis. No psychometric measures were ordered over the course of this examination, but there were no overt issues with cognitive functioning or understanding that would support a diagnosable cognitive disorder. In sum, there is no evidence of an intellectual, cognitive, or learning disorder that would impair the claimant's ability to understand tasks. While she may exhibit slower information processing, there is no evidence of any diagnosable cognitive disorder. That being said, she may struggle to remember and carry out instructions related to her fatigue and sadness, which impairs her ability to engage and attend to tasks; (2) the claimant presented as friendly and personable despite having

an underlying adjustment disorder. She exhibits adjustment difficulties related to dealing with her health issues and complained of difficulty with fatigue which is viewed a function of both her health issues and adjustment difficulties. She can be expected to exhibit mild deficits in attention and concentration, as well as pace related to her adjustment disorder, but does not exhibit any difficulty with persistence; (3) the claimant presented as pleasant and cooperative, although she also became more pensive and sad during the session. Overall, she was polite and cooperative and was easy to engage in relaxed and comfortable interactions. The claimant did not report any difficulty getting along with coworkers or bosses when she worked in the past and said that she has only left the work force due to health issues and slower work performance. While she does present with a significant adjustment disorder with depressed mood secondary to the deterioration of her health, the claimant maintained social interactions and was cooperative. She does describe more social withdrawal and frustration related to her adjustment difficulties and this would impact her ability to interact with supervision and coworkers in a work setting; and (4) again, the claimant presented as exhibiting a symptom presentation of an adjustment disorder with depressed mood related to the deterioration of her health. She remains sad over her change in functioning and stressed that her health is the primary reason for her inability to work. She presented as sad but does not appear to be psychotic and she did not report any such experiences. In sum and from a psychological perspective, the claimant is viewed to have mild limitations in her ability to respond appropriately to work pressures in an employment setting due to symptoms associated with an adjustment disorder with depressed mood. She described feeling frustrated and sad over her change in functioning, and this has resulted in social withdrawal. In sum, the claimant can be expected to have some difficulty responding appropriately to work pressures in a

> work setting related to her adjustment disorder with
> depressed mood (B9F/7-8).

Tr. 132. And the ALJ explained why she found Dr. Faust's opinions to be

persuasive:

> it is consistent with the limited course of mental
> health treatment (that is, if the claimant started to
> treat with a mental health professional as opposed
> to simply taking psychiatric medication prescribed
> by her primary care physician or neurologist, the
> claimant's symptoms might improve).

Tr. 132.

The ALJ remarked that Fitch has been on the same medication for her

multiple sclerosis since 2017, and that, while she "has received medical care

on a regular basis, she has not required or received frequent care for any

medical condition." Tr. 134; *see also* Tr. 130, 133 (ALJ commenting that Fitch

saw Harris for multiple sclerosis appointments about every six months). The

ALJ found:

> the mental status examination/clinical assessments
> and course of treatment in this case are not
> consistent with disabling mental impairment and
> are more consistent with the stated residual
> functional capacity. As recounted above, Dr. Faust
> noted some abnormal findings such as the claimant
> appeared fatigued, pensive, and sad. Dr. Faust
> reported that there was "no" evidence of an
> intellectual, cognitive, or learning disorder that
> would impair the claimant's ability to understand
> tasks and while she may exhibit slower information
> processing, there was "no" evidence of any
> diagnosable cognitive disorder. However, Dr. Faust
> also said the claimant "may" struggle to remember
> and carry out instructions related to her fatigue and
> sadness (see above). Dr. Faust also reported that the

> claimant can be expected to exhibit "mild" deficits in attention and concentration, as well as pace related to her adjustment disorder, but does not exhibit any difficulty with persistence (B9F/7). As reflected in the claimant's mental residual functional capacity stated above, Dr. Faust's concerns have been adequately addressed. Although Dr. Faust noted some abnormal findings, the claimant's providers noted no abnormal findings. In fact, Ms. Harris consistently noted that the claimant's affect, memory, and higher intellectual function were "normal" (see above). The claimant has not been psychiatrically hospitalized and there are no Emergency Department visits for acute psychiatric symptoms. The claimant has not required or received frequent or intensive outpatient mental health services. In fact, the claimant has not been treated by any mental health professional; instead, she simply takes psychotropic medication prescribed by her neurologist or primary care provider. From all of this, the undersigned finds that the claimant's symptoms and limitations are not as severe as alleged.

Tr. 134. Finally, the ALJ found that Fitch's activities of daily living were greater than Fitch's alleged limitations. Tr. 134. Fitch doesn't challenge the ALJ's evaluation of Dr. Faust's opinion or the ALJ's description of any of the evidence cited in the decision. She hasn't shown that the ALJ improperly evaluated her reports of fatigue and memory issues. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record"); 20 C.F.R. § 404.1529(c) ("other relevant evidence" includes daily activities and treatment, including medication); *see also Blacha v. Sec'y of Health & Hum. Servs.*, 927 F.2d 228, 231 (6th Cir. 1990)

(claimant's failure to seek treatment undercut complaints of disabling symptoms).

The ALJ also found persuasive the state agency reviewers' opinions, Tr. 135–36, which, the ALJ wrote, accounted for Fitch's fatigue, Tr. 135, *see* Tr. 174, 186 (opinions of Drs. Jasti and Hughes, limiting Fitch to light work with no more than four hours of walking and standing due to "[f]atigue associated with [multiple sclerosis]"), *see also* Tr. 174, 176–77, 189–90 (opinions of Drs. Delcour and Todd, relying on Dr. Fausts's opinions). Fitch doesn't challenge the ALJ's evaluations of these opinions, either. These opinions provide substantial evidence for the ALJ's decision. *See Kurman v. Kijakazi*, No. 1:20-cv-1837, 2022 WL 1067568, at *7 (N.D. Ohio Jan. 13, 2022) ("There is ample case law concluding that State Agency medical consultative opinions may constitute substantial evidence supporting an ALJ's decision") (collecting cases), *report and recommendation adopted sub nom. Kurman v. Comm'r of Soc. Sec.*, 2022 WL 765072 (N.D. Ohio Mar. 14, 2022). Moreover, the ALJ expressly stated that she limited Fitch to standing and walking for only four hours in a workday "for her subjective complaints" of "pain and fatigue." Tr. 135. So Fitch's claim that the ALJ "erroneously failed to include any limitations related to [Fitch's] documented continuing fatigue," Doc. 7, at 12, is incorrect.

Finally, the ALJ limited Fitch to performing work with no production rates or hourly quotas, nor more than occasional changes in a routine work

setting, and superficial interaction with others. Tr. 129. These limitations were consistent with Dr. Faust's and the state agency reviewers' opinions, Tr. 176–77, 189–90, 575–76, as the ALJ explained, Tr. 132, 136. Fitch hasn't shown that the ALJ's recitation of the evidence or evaluation of it was erroneous. So she hasn't shown that the ALJ erred when she didn't include limitations in the RFC for Fitch's "memory issues" or that the limitations that the ALJ did include are unsupported by substantial evidence.[5]

2.    *Fitch is not entitled to a sentence six remand*

Fitch also argues that she is entitle to a "sentence six" remand based on new evidence that she submitted to the Appeals Council—her December 20, 2022 neuropsychological testing. Doc. 7, at 16.

A court's authority to remand a case to the Social Security Administration is outlined in 42 U.S.C. § 405(g). *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006). This provision contains two sentences which authorize a remand. *Id.* A "sentence four" remand[6] occurs

---

[5]    Fitch asserts that "[t]he issue here is that [Fitch's] memory would wax and wane." Doc. 7, at 12. She only cites one treatment note showing that she reported that her symptoms waxed and waned, *id.* at 2, 10 (citing Tr. 444), and at that visit she was talking about her pain, not her memory issues, Tr. 444 (physical therapy note in which Fitch reported that her "pain … wax[ed] and wan[ed] in severity"). So Fitch has forfeited this argument. *See* Doc. 4, at 4 (Court's Initial Order stating that "[a]ny factual allegation or argument that relies on the record but that is not supported by a specific citation to the record will not be considered by the Court.").

[6]    The names of these two types of remands refer to the fourth and sixth sentences in 42 U.S.C. § 405(g). *See Melkonyan v. Sullivan*, 501 U.S. 89, 97–98 (1991) (citing *Sullivan v. Finkelstein*, 496 U.S. 617, 623–29 (1990)).

when a court finds that the ALJ's decision is faulty. *Id.* In such a case, the court's review is limited to the evidence that was before the ALJ at the time of the decision. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). A "sentence six" remand, on the other hand, is a "prejudgment" remand in which the court sends the case back to the Commissioner to consider "new and material evidence that for good cause was not previously presented to" the Commissioner. *Hollon*, 447 F.3d at 483; *Faucher v. Sec'y of Health & Hum. Servs.*, 17 F.3d 171, 174 (6th Cir. 1994). Evidence is "new" only if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Foster*, 279 F.3d at 357 (6th Cir. 2001) (quoting *Finkelstein*, 496 U.S. at 626). It is "'material' only if there is 'a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Id.* (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)). And a claimant shows "'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id.* (quoting *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (1984)). The claimant bears the burden of showing that these requirements are met. *Id.*

Here, Fitch hasn't shown that she meets any of the requirements for a sentence six remand. First, she hasn't shown that the December 20, 2022 neuropsychological testing was "new"—she concedes that it occurred two days

before the ALJ issued her decision. Doc. 7, at 16. Even if the testing was new, Fitch ignores the "good cause" requirement and doesn't allege any reason why she failed to submit the evidence earlier. *See* Docs. 7, 10. As the Sixth Circuit has explained:

> The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the "good cause" requirement. This Court takes "a harder line on the good cause test" with respect to timing and thus requires that the claimant "give a valid reason for his failure to obtain evidence prior to the hearing."

*Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 725 (6th Cir. 2012) (quoting *Oliver v. Sec'y of Health & Hum. Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)). Because she hasn't asserted "a valid reason for [her] failure to obtain the evidence" earlier, Fitch hasn't met her burden to show that she meets the "good cause" requirement for a remand. *See id; Foster*, 279 F.3d at 357 (the claimant bears the burden of showing that she meets all of the remand requirements).

Moreover, as the ALJ observed, Fitch only saw Harris every six months for her multiple sclerosis and did not seek more frequent treatment. Tr.  130–31, 133–34. This is so even though Harris regularly advised Fitch that she could return for treatment "sooner if needed." Tr. 588, 626, 751. Fitch doesn't explain why, despite her alleged worsening symptoms, she didn't return to Harris sooner to obtain updated neuropsychological testing. *See, e.g., Gullas v. Berryhill*, No. 1:18-cv-719, 2019 WL 1261419, at *23 (N.D. Ohio Feb. 5, 2019) (claimant did not meet his burden to show good cause when he failed to obtain

testing prior to the hearing or ask the ALJ to keep the record open so that he could obtain testing and submit the results) (citing cases), *report and recommendation adopted*, 2019 WL 1589915 (N.D. Ohio Apr. 12, 2019).

Furthermore, Harris ordered neuropsychological testing for Fitch on November 15, 2022, Tr. 751——two weeks before Fitch's administrative hearing—and the testing occurred on December 20, 2022—two days before the ALJ's decision. Tr. 143. And yet, Fitch's counsel didn't advise the ALJ that updated testing had been scheduled and ask to keep the record open to await the testing. *See, e.g., Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148–49 (6th Cir. 1996) (no good cause when the claimant's counsel didn't notify the ALJ that the claimant needed a psychiatric exam; "[c]ounsel had an entire month to notify the ALJ before the ALJ made his decision, but Cline's lawyer elected to wait and submit the new evidence," an evaluation that occurred the day after the ALJ's decision, "to the Appeals Council for the first time. This is clearly not good cause.").

Finally, Fitch has not met her burden to show that the new evidence is material. Fitch argues that the testing showed that she had "significantly impaired sustained attention in the context of moderately severe depression and anxiety." Doc. 7, at 16 (citing Tr. 118). As a result of this finding, Fitch asserts, Dr. Galioto recommended that Fitch "would likely benefit from scheduling breaks when completing difficult and/or sustained tasks, breaking

large tasks into smaller components, limiting distractions, and minimizing multitasking demands." *Id.*, Tr. 118.

But Dr. Galioto commented that, compared to Fitch's last neuropsychological testing in January 2021, "there does not appear to have been significant cognitive decline. In fact, [Fitch] demonstrated mild improvements in many areas." Tr. 118. And she expressly linked Fitch's cognitive difficulties with Fitch's "rather significant symptoms of depression and anxiety," Tr. 118—not with Fitch's multiple sclerosis. This is important because this is the same finding that Dr. Faust made, as the ALJ discussed. Tr. 132 (ALJ explaining that Dr. Faust found "no overt issues with cognitive functioning or understanding that would support a diagnosable cognitive disorder" and "no evidence of an intellectual, cognitive, or learning disorder that would impair the claimant's ability to understand tasks," but that, rather, Fitch's limitations were due to her "significant adjustment disorder with depressed mood"); Tr. 575 (Dr. Faust's findings).

Meanwhile, the ALJ discounted Fitch's allegations of symptoms because Fitch had a "limited course of mental health treatment," which the ALJ accurately described as "simply taking psychiatric medication prescribed by her primary care physician or neurologist" rather than "treat[ing] with a mental health professional." Tr. 132. Indeed, Dr. Galioto even suggested that Fitch "consider engaging in some form of behavioral treatment (psychotherapy, counseling)," and added that "[t]his can also be helpful for fatigue

management." Tr. 118. *See also* Tr. 454 (January 2021 neuropsychological testing indicating that Fitch "is experiencing symptoms consistent with moderately severe depression" and that "[t]o the extent that she is able to address her apparent depression … her reported cognitive lapses may resolve"); Tr. 610 (Fitch's primary care doctor referring Fitch to a psychiatrist for her reported cognitive changes in May 2022).

In short, Dr. Galioto's findings and recommendations are consistent with the other evidence in the record—namely Dr. Faust's opinion—and they support the ALJ's findings and reasoning in her decision. So Fitch hasn't shown that there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with" Dr. Galioto's test results. *See Foster*, 279 F.3d at 357 (6th Cir. 2001).

**Conclusion**

For the reasons explained above, I recommend that the Commissioner's decision be affirmed.


Dated: June 24, 2024


       */s/ James E. Grimes Jr.*
       James E. Grimes Jr.
       U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).